IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| KEVIN HUGHES, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 11 C 219 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| ROBERT WERLINGER, | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

On March 25, 2011, Kevin Hughes filed a petition for a writ of habeas corpus under 28 U.S.C § 2241 ("the petition") against the warden of the Federal Correction Institution in Oxford, Wisconsin, seeking relief from a disciplinary conviction and reinstatement of his lost good-time credits on various constitutional and administrative grounds.[1] (Dkt. 1.) For the following reasons, the petition for writ of habeas corpus is denied.[2]

**BACKGROUND**

Hughes is serving a prison term of 84 months for knowingly distributing and possessing with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1)(B) and 18 U.S.C. § 2. (Dkt. 5, Ex. 2.) From October 13, 2009 to April 27, 2010, Hughes was housed at the Federal Correctional Institution in Fort Dix, New Jersey ("FCI-Fort Dix"). (*Id.*, Ex. 1.) The Federal

---

[1] The petition originally named Carol Holinka as the respondent in this suit, as she was the warden of the prison at the time Hughes filed his petition. Robert Werlinger replaced Holinka and was thereby substituted as the named respondent.

[2] Hughes initially filed in the United States District Court for the Western District of Wisconsin, which had proper jurisdiction pursuant to 28 U.S.C § 2241. The case was subsequently transferred to this court to perform the duties of the Western District of Wisconsin on October 7, 2013. (*See* dkt. 7.)

Bureau of Prisons ("the FBP") then transferred him to the Federal Correctional Institution in Oxford, Wisconsin ("FCI-Oxford").[3]  (*Id.*)

On December 1, 2009, while in custody at FCI-Fort Dix, Hughes was written up for possession of contraband.  (Dkt. 5, Ex. 3 at 2.)  According to the incident report, while a FCI-Fort Dix officer was conducting a "shak[e] down," he discovered a cellular telephone charger located in a pair of Hughes' shoes that were underneath his bunk.[4]  (*Id.*)  The incident report charges Hughes with violating FBP Code 108, Possession of a Hazardous Tool, as enumerated in the Code of Federal Regulations, 28 C.F.R. § 541.13, Tbl. 3.[5]  (*Id.*)

Hughes received a copy of the incident report on December 1, 2009.  (*Id.*)  On December 4, 2009, Hughes appeared before the Unit Disciplinary Committee ("the UDC") and denied having possessed the cellular telephone charger.  (*Id.* at 4.)  Based on the seriousness of the offense, however, the UDC referred the incident to a Discipline Hearing Officer ("DHO").  (*Id.*)  Also on December 4, 2009, Hughes met with a case manager, N. Watkins-Ward, who advised him of his rights at his upcoming disciplinary hearing.  (*Id.* at 6.)  In particular, Hughes was notified of his right (1) to have a written copy of the charges against him at least 24 hours prior to the hearing; (2) to have a staff member represent him before the DHO; (3) to call witnesses and present documentary evidence before the DHO; (4) to present a statement or remain silent; (5) to be present throughout the discipline hearing except during a period of deliberation or when

---

[3]  It is unclear to the court whether Hughes remains in custody or has since been released.

[4]  The officer also discovered two "stingers," (*i.e.*, pieces of wires usually stuck in electrical outlets to heat food or to use as part of a tattoo gun), and a "leafy green substance." (Dkt. 5, Ex. 3 at 5.)  The operations lieutenant only confiscated the cellular telephone charger and the "leafy green substance." (*Id.*)  Although Hughes represented to prison officials that the "leafy green substance" was marijuana (*id.* at 8), it tested negative for marijuana so Hughes was not charged with possession of a narcotic.  (Dkt. 3 at 4 n.2.)

[5]  The Code of Federal Regulations was updated in 2010 and the pertinent section is now codified at 28 C.F.R. § 541.3, Tbl. 1.

institutional safety would be jeopardized; (6) the right to be advised of the DHO's decision and supporting facts; and (7) the right to appeal the DHO's decision within 20 days. (*Id.*) Hughes did request staff representation at his hearing and also requested to call two witnesses at the hearing. (*Id.* at 7.) Hughes signed forms on December 4, 2009, reflecting that he had been read his rights and regarding his preferences for his DHO hearing. (*Id.* at 6-7.)

Hughes appeared before the DHO on February 19, 2010, and was represented by a staff member at the hearing. (*Id.* at 9.) At the hearing, Hughes denied the charge against him, stating that he "had no idea the [cellular telephone] charger was there." (*Id.*) The two witnesses he called declined to testify and were requested to submit written statements but both declined to do so. (*Id.* at 9-10, 12-13.)

The DHO rendered his decision on March 31, 2010, finding that Hughes violated Code 108 by possessing a hazardous tool, *i.e.*, a cellular telephone charger. The DHO explained, "A cell phone charger falls under [t]he classification of hazardous tools, as it can be used in concert to charge a cell phone to arrange rendezvous for escapes and can be used to arrange contraband introductions, and further allows the inmate to make contact with individuals outside the institution, possibly for illicit or illegal activities, without knowledge of staff." (*Id.* at 11.) The DHO also referred to a memorandum dated December 28, 2009, issued by the Warden at FCI-Ft. Dix, explicitly warning inmates that those found in possession of devices such as cellular telephones or chargers would be charged with a violation of Code 108 because cellular telephones were considered "a threat to the security and orderly running of the institution." (*Id.*) The Warden had issued similar memoranda on May 5, 2005, and October 4, 2006. (Dkt. 4, Exs. 1-2.) The October 2006 memorandum was "posted on the wall in all housing units throughout

the institution," and it is FCI-Fort Dix's practice "to post all memorandums for the inmate population on the bulletin boards in the housing units." (Dkt. 4 ¶¶ 3, 5.)

The DHO imposed various sanctions on Hughes for violating Code 108. He imposed thirty days of disciplinary segregation suspended pending clear conduct, thirty days of loss of commissary privileges, six months loss of telephone privileges, thirty days loss of visiting privileges, and forty days of lost good-conduct time credit. (Dkt. 5, Ex. 3 at 11.) Hughes received a copy of the DHO report and appealed the decision to the regional director on April 1, 2010. (Dkt. 5, Ex. 4 at 2.) He argued in his appeal that the evidence demonstrated that the cellular telephone charger did not belong to him, and that he was deprived of the opportunity to prepare a defense. (*Id.* at 3.) The regional director upheld the DHO's decision on May 12, 2010 finding that there was no evidence presented at the hearing that the cellular telephone charger belonged to anyone else, and that the "DHO reasonably determined you committed the offense as charged." (*Id.* at 8.) The regional director also determined that Hughes had been given "sufficient notice to prepare a defense to the charge as the incident report detailed that the charger was found in your unsecured property." (*Id.*) Hughes, in turn, appealed this decision to the FBP's central office on May 24, 2010 (*id.* at 9), but this appeal was denied on January 7, 2011 (*id.* at 11). The pending 28 U.S.C. § 2241 petition followed.

## LEGAL STANDARD

Absent its suspension, the writ of habeas corpus is available to every individual detained in the United States. *See Hamdi* v. *Rumsfeld*, 542 U.S. 507, 525, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (quoting U.S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.")). A writ of habeas corpus is an extraordinary remedy that should not be issued

4

merely to "do service for an [additional] appeal." *Bousley* v. *United States*, 523 U.S. 614, 621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (quoting *Reed* v. *Farley*, 512 U.S. 339, 354, 114 S. Ct. 2291, 129 L. Ed. 2d 277 (1994)).

Prisoners seeking to overturn the results of an administrative hearing that resulted in a loss of good time credits must petition for a writ of habeas corpus. *See Moran* v. *Sondalle*, 218 F.3d 647, 650-51 (7th Cir. 2000). Although prisoners do not forfeit their rights under the Due Process Clause, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full array of rights due a defendant in such proceedings does not apply." *Wolff* v. *McDonnell,* 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (citing *Morrissey* v. *Brewer,* 408 U.S. 471, 488, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)).

When an inmate faces the possible loss of good time credits in a disciplinary proceeding, he is entitled to certain due process protections. These include (1) advance written notice of the charges against him; (2) a written statement by the factfinders of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing in which he is afforded the right to call witnesses and present evidence, (so long as doing so is not inconsistent with institutional safety and correctional concerns); (4) the opportunity to have non-attorney representation if the inmate is illiterate or the complexity of the hearing makes one necessary; (5) an impartial decision-maker; and (6) a written decision. *Id.* at 564-71. A federal court will only disturb the findings of fact of a disciplinary hearing officer if they are unsupported by any evidence, or when wholly arbitrary and capricious. *See Superintendent, Mass. Corr. Inst.* v. *Hill,* 472 U.S. 445, 456, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985). Therefore, the question on review is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56.

## ANALYSIS

Hughes' main argument is that possession of a cellular telephone charger was miscategorized as a Code 108 offense. Instead, he argues, it should have been categorized as a Code 305 offense, which is a moderate severity violation (as opposed to Code 108, which is a greatest severity violation), because a moderate severity violation normally does not lead to the loss of good time credits. (Dkt. 1 at 2.) He argues that (1) his due process rights were violated because he was never notified of the punishment for the charged conduct; (2) the FBP changed its rules in violation of the Administrative Procedure Act ("the APA"); (3) Code 108 is unconstitutionally vague; and (4) he was treated differently from other similarly situated inmates in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution. (*Id.* at 3.) He does not challenge whether there was enough evidence to uphold the DHO's finding that the cellular telephone charger belonged to him even though this was his main contention throughout his appeals.

**I.      Whether Hughes' Due Process Rights Were Violated by Failure to Notify Him of His Potential Punishment**

Hughes argues that his due process rights were violated because he was not notified that possession of a cellular telephone[6] or charger had been "elevated" from a Code 305 to a Code 108 violation. (Dkt. 1 at 5.) "Due process requires that inmates receive fair notice of a rule before they can be sanctioned for its violation." *Forbes* v. *Trigg*, 976 F.2d 308, 314 (7th Cir. 1992); *see also Rios* v. *Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987) (inmate could not be punished

---

[6]     Hughes frames much of his argument around the possession of cellular telephones instead of cellular telephone chargers, despite the fact that he was not charged with possession of a cellular telephone. As one can make limited use of a cellular telephone without a charger, however, the court finds that this makes little difference in considering the merits of Hughes' claim. *See Douglas* v. *Zickefoose*, Civ. No. 11-406, 2012 WL 266364, at *14 (D.N.J. Jan. 27, 2012) ("[T]he court finds no error in defining a cell phone charger as a [hazardous tool pursuant to Code 108], because it enables a cell phone to make calls and its only logical purpose is to charge a cell phone for operation.").

when he was given "no prior warning that his conduct might be proscribed"); *Terry* v. *Morgan*, 930 F.2d 25, 1991 WL 54856, at *3 (7th Cir. Apr. 3, 1991) ("Although due process requirements may be less stringent when applied to prison regulations, a prison rule must nonetheless give the prisoner fair notice of the prohibited conduct.") (table decision). The Seventh Circuit has held posting rules in the prison and explaining potential penalties provides inmates with sufficient notice of a prison policy. *See Forbes*, 976 F.2d at 314 (posting prison's urine testing policy in petitioner's work station sufficient to find constructive notice); *Graham* v. *McBride*, 74 F.3d 1242, 1996 WL 19240, at *2 (7th Cir. Jan. 17, 1996) (same) (table decision). But "[d]ue process does not require specific notice of a rule prohibiting an act commonly known to be unlawful." *Ard* v. *Hanks*, 67 F. App'x 946, 949 (7th Cir. 2003).

Hughes argues he was not given adequate notice that possession of a cellular telephone was categorized as a greatest category offense. But the record indicates that he received advance written notice of the charges against him. (*See generally* dkt. 5, Ex. 3.) Hughes had the opportunity to object to the charges and evidence against him, which he did. (*Id.* at 9-10.) Hughes has not claimed that the DHO was not a neutral or detached body. A staff representative advised Hughes of his rights before the DHO on December 4, 2009, and he chose to be represented at his hearing before the DHO on February 19, 2010. (*Id.*) Finally, he was provided a written statement of the DHO's findings and evidence relied upon in the form of the DHO Report. (*Id.*) Thus, Hughes was provided with the necessary due process over the course of his disciplinary hearing.

Moreover, Hughes argues that he was denied the due process of the law because he was never notified of changes or amendments to the rules that possession of a cellular telephone was "increased" from a Code 305 moderate level violation to a Code 108 greatest severity level

7

violation. (Dkt. 1 at 2.) This argument is grounded in the fact that sometime after Hughes was sanctioned, the FBP changed the language of Code 108 to specifically include "portable telephones" in the examples of "hazardous tools." (*Id.* at 3.) He claims that the change in language is evidence that cellular telephones were not covered by the earlier version of Code 108 and his violation should therefore have been classified under Code 305. Hughes concludes that the FBP violated due process by "chang[ing] the legal consequences of [possessing a cellular telephone charger, thus] affecting good conduct time credits." (*Id.* at 2.)

Hughes' argument is controverted by the facts. The Warden at FCI-Ft. Dix warned inmates on a number of occasions that possession of a cellular telephone might be charged with a violation of Code 108. (Dkt. 4 & Exs.) Shortly after Hughes was charged with violating Code 108, a memorandum was issued to the prisoner population on December 28, 2009, warning inmates that those "'found in possession of electronic communication devices, or related equipment such as a cell phone, cell phone charger, . . . etc., will be charged with a violation of Code 108' possession of a hazardous tool." (Dkt. 4 ¶ 4 (citations omitted).) This memorandum supplemented similar ones from the Warden dated May 5, 2005, and October 4, 2006. (*Id.*, Exs. 1-2.) The October 2006 memorandum was "posted on the wall in all housing units throughout the institution" (*id.* ¶ 3) and informed inmates that those found in possession of, *inter alia*, a cellular telephone charger "may be charged with a violation of Code 108, Possession, Manufacture, or Introduction of a Hazardous Tool[.]" (*Id.* Ex. 2.) Hughes was thus afforded all due process to which he was entitled. He had been put on notice not only that he could be punished for having a cellular telephone charger, but also that having a cellular telephone charger would be charged under Code 108 and categorized as a greatest category offense. He

8

was notified of the charges against him before his hearing and was provided with ample opportunity to defend himself to the DHO. The due process claim fails.

> **B.** **Whether the Interpretation of Code 108 Violated the APA**

Hughes argues that the FBP violated his due process rights by defining "hazardous tool" to include a cellular telephone charger without amending the Code pursuant to the APA. (Dkt. 1 at 5.) Hughes notes that there was a proposed amendment to Code 108 to include "portable telephones" through proper APA procedure, but the proposed language was not adopted until after his violation. (*Id.*) Hughes argues that DHO's finding that possession of a cellular telephone charger was a violation of Code 108 is equivalent to enforcing the proposed language as if it had already been implemented. (*Id.*)

The APA requires that requires that proposed regulations be published in the Federal Register for notice and comment procedures. *See Metro. Sch. Dist. of Wayne Twp., Marion Cnty., Ind.* v. *Davila,* 969 F.2d 485, 488-89 (7th Cir. 1992). But the APA does not require that administrative agencies follow notice and common procedures in the case of "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553; *see also Metro. Sch. Dist.*, 969 F.2d at 488-89. Interpretive rules are statements "as to what the administrative officer thinks the statute or regulation means." *Bd. of Trustees of Knox Cnty. Hosp.* v. *Shalala*, 135 F.3d 493, 501 (7th Cir. 1998) (quotation marks and citation omitted). Courts defer to agencies' interpretation of their own regulations unless the interpretation is plainly erroneous. *Fal-Meridian, Inc.* v. *U.S. Dep't of Health & Human Servs.*, 604 F.3d 445, 450 (7th Cir. 2010). "The distinction between interpretive. . . and substantive (or 'legislative') rules is admittedly far from crystal-clear." *Metro. Sch. Dist.*, 969 F.2d at 489 (quoting *Chem. Waste Mgmt., Inc.* v. *EPA*, 869 F.2d 1526, 1534 (D.C. Cir.1989)). To determine whether a rule

is interpretive, the court considers the agency's own characterization of the rule, whether the rule simply states that an agency thinks a statute means or creates new laws, rights, or duties, and whether the rule relies upon the language of the statute and its legislative history. Interpretive rules simply state what the administrative agency thinks the underlying statute means and reminds affected parties of existing duties. *Metro Sch. Dist.*, 969 F.2d at 489 (citations omitted).

Hughes' argument regarding the APA fails because Code 108 is an interpretive rule, and the inclusion of cellular telephones and chargers in that rule was at the FBP's discretion. *See Hall* v. *Zickefoose*, 448 F. App'x 184, 186 (3d Cir. 2011) (FBP could interpret Code 108 to include cellular telephones because it is an interpretive rule and inclusion of cellular telephones did not add language to or amend the regulation). The FBP is entitled to interpret Code 108 as it sees fit, and need not endure the onerous notice and comment procedures to do so. *See id.* The later amendment of Code 108 to explicitly include cellular telephones does not change this analysis. Code 108 as it was in force when Hughes was disciplined defined a "hazardous tool" as an item that is ". . . most likely to be used in an escape or escape attempt or to serve as a weapon, or capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hack-saw blade." 28 C.F.R. § 541.13, Tbl. 3 (2009). This list is not exhaustive. By way of example, explosives, rope, blueprints of the prison, maps of surrounding areas, or any number of other tools are surely likely to "be used in an escape or escape attempt" but they were not listed as examples of "hazardous tools." *Id.* Code 108 thus confers a degree of latitude to DHOs in determining what is a "hazardous tool" in the interest of institutional safety, and determining that a cellular telephone charger is a "hazardous tool" is not clearly wrong or inconsistent with Code 108.

Moreover, many courts have concluded that it is not plainly erroneous to classify cellular telephones or chargers as "hazardous tools." *See e.g.*, *Douglas* v. *Zickefoose*, Civ. No. 11-406, 2012 WL 266364, at *14 (D.N.J. Jan. 27, 2012) (holding DHO did not abuse his discretion in finding that habeas petitioner had committed a Code 108 violation by possessing a cellular telephone charger); *Acevedo-Garcia* v. *Rios*, No. 12 C 1113 (C.D. Ill. June 11, 2012), ECF 8 at 4 (cellular telephone).[7] A cellular telephone allows an inmate to communicate with individuals outside of the prison without the supervision of FBP authorities, and is of little use without a charger. The DHO's conclusion is both reasonable and within the spectrum of interpretive latitude afforded to the FBP in applying its disciplinary code.

### C. Whether the Regulation is Unconstitutionally Vague

Hughes next argues his due process rights were violated because Code 108 was unconstitutionally vague. (Dkt. 1 at 7.) "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). "A regulation must be sufficiently definite to give people of ordinary intelligence notice of the conduct it prohibits." *Isby-Israel* v. *Finnan*, 347 F. App'x 253, 255 (7th Cir. 2009) (citing *United States* v. *Turcotte*, 405 F.3d 515, 531 (7th Cir. 2005)). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982).

---

[7] *See also Hall*, 448 F. App'x at 186; *Robinson* v. *Warden*, 250 F. App'x 462, 464 (3d Cir. 2007); *Myrieckes* v. *Caraway*, No. L-11-917, 2012 WL 527585, at **6-7 (D. Md. Feb. 16, 2012); *Douglas* v. *Zickefoose*, Civ. No. 11-406, 2012 WL 266364, at *14 (D.N.J. Jan. 27, 2012); *Knaub* v. *Zickefoose*, Civ. No. 11-938, 2011 WL 6153701, at **6-7 (D.N.J. Dec. 12, 2011); *Garcia* v. *Zickefoose*, Civ. No. 10-1725, 2011 WL 6179785, at **9-12 (D.N.J. Dec. 12, 2011); *Hudson* v. *Zickefoose*, Civ. No. 10-0251, 2010 WL 4746220, at *3 (D.N.J. Nov. 15, 2010). Most of these cases involve prisoners at FCI-Ft. Dix.

Vagueness principles extend to prison regulations. *See Koutnik* v. *Brown*, 456 F.3d 777, 783 (7th Cir. 2006). Regardless, "[s]ome open-ended quality is essential if a prison is to have any guidelines," *id.* (quoting *Borzych* v. *Frank*, 439 F. 3d 388, 391 (7th Cir. 2006), as latitude is necessary to ensure safety and order in a dangerous prison environment. *See Meyers* v. *Aldredge*, 492 F.2d 296, 310 (3d Cir. 1974); *Wolfel* v. *Morris*, 972 F.2d 712, 717 (6th Cir. 1992). Courts defer to prison authorities' expertise when interpreting prison rules "unless fair notice was clearly lacking." *Hadden* v. *Howard*, 713 F.2d 1003, 1008 (3d Cir.1974). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Terry* v. *Morgan*, No. 87 C 8575, 1990 WL 70868, at *5 (N.D. Ill. Apr. 30, 1990), *aff'd* 930 F.2d 25 (7th Cir. 1991) (quoting *Vill. of Hoffman Estates,* 455 U.S. at 495 n. 7) (rejecting inmate's void for vagueness argument).

In this case, the prison staff repeatedly clarified and warned prisoners that possession of cellular telephones and chargers would be punishable under Code 108. (*See* dkt. 4 & Exs.) Additionally, the definition of "hazardous" in Code 108 extends to tools that may be used "in an escape attempt" and endanger "institutional safety." These terms clearly provide notice to reasonable prisoners of ordinary intelligence that possession of a cellular telephone and its accompanying charger could be punished under Code 108. *See Hall*, 448 F. App'x at 186 (court "not persuaded that [Code] 108 is unconstitutionally vague" when applied to possession of cellular telephones). The DHO found that possession of the cellular telephone was a violation of Code 108 because it was likely to be used in an escape attempt and it was hazardous to institutional security. (Dkt. 1 Ex. 1 at 3.) Hughes' vagueness challenge fails.

**D.     Whether the FBP Violated the Equal Protection Clause**

Hughes' final claim is that the FBP violated the Equal Protection Clause of the Fourteenth Amendment by treating him differently from similarly situated prisoners by choosing

to classify his violation under Code 108 instead of Code 305. He argues that this unequal treatment was the result of intentional or purposeful discrimination.

The Equal Protection Clause of the Fourteenth Amendment provides "no State shall… deny to any person with its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14. "Prisoners do not surrender their rights to equal protection at the prison gate." *Hughes* v. *Lane*, 851 F.2d 867, 881 (7th Cir. 1988). "Unequal treatment among inmates, however, is justified if it bears a rational relation to legitimate penal interest." *Id.* (citing *Hudson* v. *Palmer*, 468 U.S. 517, 522-23, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). Penal interests include security and discipline. *Hudson*, 468 U.S. at 523.

To establish a claim under the Equal Protection Clause, Hughes must demonstrate that (1) he is otherwise similarly situated to members of the unprotected class; (2) he was treated differently from members of the unprotected class; and (3) the respondent acted with discriminatory intent. *See Greer* v. *Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000); *see also Green* v. *Dart*, No. 12 C 5377, 2013 WL 3853808, at *7 (N.D. Ill. July 23, 2013). In addition, Hughes can establish a "class-of-one" equal protection claim by demonstrating that he was intentionally treated differently from others who are similarly situated and there was no rational basis for the different treatment. *See Green*, 2013 WL 3853808, at *7 (citing *Engquist* v. *Oregon Dep't of Agriculture,* 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008); *Village of Willowbrook* v. *Olech,* 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).

Other than generally alleging that prison officials acted "by fiat" in choosing which Code provision to apply to prisoners found with cellular telephones, the only concrete allegation Hughes makes is that another prisoner had his Code 108 punishment expunged. In particular, he points to the facts of *Neagle* v. *Grondolsky*, Civ. No. 09-2016, 2010 WL 2546021 (D.N.J. June

18, 2010), as evidence that he was treated differently than a similarly situated prisoner. In *Neagle*, an inmate was disciplined for possession of tobacco, snuff, creatine, vodka, and a cellular telephone. *Id.* at *2. The inmate was charged with violating both Code 108 and 305. *Id.* On administrative appeal, the Northeast Regional Office expunged the Code 108 violation, but the district court opinion provides no indication of why this may have happened or how the FBP interpreted Code 108 over the course of the disciplinary proceedings. *See id.* Hughes does not provide the court with any other information regarding that inmate's specific characteristics, prior criminal history, behavioral history while in prison, or disciplinary proceedings. His bare assertion that Neagle was treated differently because his Code 108 violation was expunged and Hughes' was not because prison officials had animus towards him is insufficient to make out an equal protection claim.

Moreover, and as discussed more fully above, a string of cases from FCI-Ft. Dix upholds the FBP's decision to categorize the possession of a cellular telephone as a Code 108 violation. *See supra* n.7. These cases illustrate that the treatment of Hughes was not unique. Finally, Hughes has not provided any evidence to suggest that the allegedly disparate treatment was intentionally discriminatory. His equal protection argument thus fails.

## CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is hereby denied.

Dated: April 28, 2014

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge